UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
WILSON CANTARERO LOPEZ,

                Plaintiff,

        v.

COUNTY OF SUFFOLK, et al.,

                Defendants.

----------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
23-CV-2230-SJB-JMW

**BULSARA, United States District Judge:**

Wilson Cantarero Lopez ("Cantarero Lopez") filed this case after he was hospitalized for ten days from injuries inflicted by corrections officers at the Suffolk County Correctional Facility in Riverhead, New York.  Cantarero Lopez brings claims under § 1983 for excessive force, failure to intervene, and bodily integrity violations, as well as state law claims for assault, battery, negligence, and emotional distress against Suffolk County, the Suffolk County Sheriff's Department; Sergeants Kim Snider, Travis Accardi, Arthur LaFranca, and Anthony Richetti; Lieutenants Mark Hawthorne, Zorcik, and Michael Ervolino; and Corrections Officers Ivan Skolnick, Kenneth DeFelice, Brian Bangel, Daniel Shaw, Darren Dobriner, Daniel McManus, and D. Lostritto.  Defendants have moved for summary judgement.  For the reasons explained below, the motion is granted in part and denied in part.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

"A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b). In both instances, the party must support its position by citing to admissible evidence from the record. *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting

2

a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible

evidence).  The Court must also disregard conclusory denials that lack citations to admissible evidence.  *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.  They should contain factual assertions, with citation to the record.  They should not contain conclusions[.]*"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003).  Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted."  Loc. Civ. R. 56.1(c).  The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits.  *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

On March 24, 2022, Cantarero Lopez was incarcerated at Suffolk County Correctional Facility in Riverhead, New York.  (Defs.' Rule 56.1 Statement ("Defs.' 56.1 Stmt."), Dkt. No. 42-2 ¶¶ 3–5; Pl.'s Rule 56.1 Resp. ("Pl.'s 56.1 Resp."), Dkt. No. 42-22 ¶¶ 3–5).  He was locked in his cell, while another inmate, Nicholas Lobianco was

standing outside.  (*Id.* ¶ 12; Defs.' 56.1 Stmt. ¶ 12).  The two began arguing over trading food around 4:30 P.M., and Lobianco threw food into Cantarero Lopez's cell, after which Cantarero Lopez retaliated by spitting blood (due to a recent root canal), throwing toilet water at Lobianco, and smashing a bin against his cell wall.  (*Id.* ¶¶ 12–13, 15–16, 20; Pl.'s 56.1 Resp. ¶¶ 12–13, 15–16, 20).  Cantarero Lopez was informed by prison officials that he would be relocated to another cell; an extraction team was assembled because he had been spitting blood and throwing toilet water.  (*Id.* ¶¶ 21–22, 278; Defs.' 56.1 Stmt. ¶¶ 21–22, 278).  Cantarero Lopez testified that six or seven officers then entered his cell.  (*Id.* ¶ 22; Pl.'s 56.1 Resp. ¶ 22).  The cell extraction was filmed and the video was provided to the Court, however, what transpired inside the cell is not clearly visible.

Cantarero Lopez testified that he received an instruction from an officer to "stand up and get against the wall," which he did.[1]  (*Id.* ¶ 23; Defs.' 56.1 Stmt. ¶ 23; *see* Dep. of Wilson Cantarero Lopez ("Cantarero Lopez Dep."), attached to Pl.'s Opp'n as Ex. B, Dkt. No. 42-26 at 29:18–30:3).  While he was against the wall, one officer pushed him against the wall and another pulled him off his feet, causing him to fall and cut his forehead on the side of his bed.  (Pl.'s 56.1 Resp. ¶ 26; Defs.' 56.1 Stmt. ¶ 26).  He says he never resisted, but officers nonetheless dragged him on the floor into the middle of the cell.  (Pl.'s Rule 56.1 Counterstatement of Facts ("Pl.'s 56.1 Counterstatement"), Dkt. No. 42-22 ¶¶ 20, 22–23).  They then pinned him down, restrained him, and repeatedly

---

[1] Later, Cantarero Lopez says he did not understand what the officers were saying when they first gave him commands to stand up.  (Defs.' 56.1 Stmt. ¶ 344; Pl.'s 56.1 Resp. ¶ 344; *see* Cantarero Lopez Dep. at 54:4-7).

kicked and punched him, though he cannot identify which officers were striking him. (Defs.' 56.1 Stmt. ¶¶ 25–29; Pl.'s 56.1 Resp. ¶¶ 25–29).

During cell extractions, officers are typically assigned to one of five roles, "tactical shield, right arm, left arm, legs, and mechanical restraints," while a separate sergeant oversees the process. (*Id.* ¶ 167; Defs.' 56.1 Stmt. ¶ 167). The shield officer enters first, followed by the officer assigned to the individual's legs, and then the two officers assigned to each arm. (*Id.* ¶ 232; Pl.'s 56.1 Resp. ¶ 232). A sergeant, Travis Accardi, and lieutenant, Mark Hawthorne, were present for the extraction. (*Id.* ¶ 186; Defs.' 56.1 Stmt. ¶ 186).

Kenneth DeFelice was part of the extraction team, and was assigned to make sure incarcerated individuals in other cells were facing the back wall for officer safety. (*Id.* ¶¶ 147, 195; Pl.'s 56.1 Resp. ¶¶ 147, 195). Both sides agree he could not observe what was happening in Cantarero Lopez's cell, and did not recall what, if anything, he heard happening. (*Id.* ¶ 150; Defs.' 56.1 Stmt. ¶ 150).

Brian Bangel was assigned to the shield position, which is supposed to press a plastic shield against the individual being moved against the back wall so other officers can reach their designated assignments. (*Id.* ¶ 170; Pl.'s 56.1 Resp. ¶ 170). His shield made contact with Cantarero Lopez's back. (*Id.* ¶ 198; Defs.' 56.1 Stmt. ¶ 198).

Daniel Shaw was assigned to control Cantarero Lopez's legs. (*Id.* ¶ 216; Pl.'s 56.1 Resp. ¶ 216). Shaw was in the cell during the extraction, but did not kick or punch Cantarero Lopez, nor did he witness another officer doing so. (*Id.* ¶¶ 223–24; Defs.' 56.1 Stmt. ¶¶ 223–24).

6

Daniel McManus and Darren Dobriner were each assigned to one of Cantarero Lopez's arms so he could be handcuffed. (*Id.* ¶¶ 231, 245; Pl.'s 56.1 Resp. ¶¶ 231, 245).

Ivan Skolnick was assigned the role of placing Cantarero Lopez in mechanical restraints. (*Id.* ¶ 260; Defs.' 56.1 Stmt. ¶ 260). Though the parties dispute whether Cantarero Lopez was ever resisting, they agree that when Skolnick entered the cell to apply restraints, Cantarero Lopez was not resisting, and before that, Skolnick could not see inside the cell—aside from being able to view the shield officer's (Bangel) back. (*Id.* ¶¶ 263–64; Pl.'s 56.1 Resp. ¶¶ 263–64). Cantarero Lopez was handcuffed and shackled in the cell. (*Id.* ¶ 271; Defs.' 56.1 Stmt. ¶ 271).

Defendants generally contend that Cantarero Lopez was resisting. Accardi can be heard telling him to stop resisting and stop kicking the officers on video. (*E.g., id.* ¶¶ 347, 352, 354). Skolnick, Shaw, McManus, Dobriner, and Bangel completed incident reports stating that Cantarero Lopez did not comply with the instruction to face the back wall and put his hands through the food slot to be handcuffed. (*Id.* ¶¶ 375, 377–80). McManus, Dobriner, and Bangel also noted that there was a brief struggle to gain control over Cantarero Lopez. (*Id.* ¶¶ 378–80).

There is no dispute that Sergeants Kim Snider and Accardi, and Lieutenants Hawthorne, Zorcik, and Michael Ervolina did not enter Cantarero Lopez's cell for the extraction. (*Id.* ¶ 255; Pl.'s 56.1 Resp. ¶ 255). Accardi did not see any officer kick, punch, or strike Cantarero Lopez, and Snider was not present for the cell extraction in any capacity. (*Id.* ¶¶ 280, 293; Defs.' 56.1 Stmt. ¶¶ 280, 293).

7

Once he was in mechanical restraints, Cantarero Lopez was escorted out of the cell and placed in the restraint chair, and as can be seen on video, he had a cut above his left eyebrow.  (*Id.* ¶¶ 355–57; Pl.'s 56.1 Resp. ¶¶ 355–57).  He was then moved to a separate detention cell.  (*Id.* ¶ 361; Defs.' 56.1 Stmt. ¶ 361).  He was evaluated by medical staff, who recommended he be sent to a hospital.  (*Id.* ¶¶ 368–70; Pl.'s 56.1 Resp. ¶¶ 368–70).  Cantarero Lopez testified that he was choking on blood and struggling to breathe while awaiting transportation, and that he told officers, but nobody responded.  (*Id.* ¶ 38; Defs.' 56.1 Stmt. ¶ 38).  Cantarero Lopez was hospitalized for ten days following the extraction: he had internal bleeding in his abdomen that required surgery, which was performed the day after the extraction.  (*Id.* ¶¶ 47–48, 53; Pl.'s 56.1 Resp. ¶¶ 47–48, 53).  He also received stitches for the cut on his forehead.  (*Id.* ¶ 49; Defs.' 56.1 Stmt. ¶ 49).  And one of his teeth had been knocked out during the extraction, for which he received a replacement.  (*Id.* ¶ 52; Pl.'s 56.1 Resp. ¶ 52).

None of the involved officers were subject to any discipline for the cell extraction.  (*Id.* ¶¶ 115, 240, 252, 269; Defs.' 56.1 Stmt. ¶¶ 115, 240, 252, 269).

Cantarero Lopez filed his Amended Complaint on June 9, 2023.  (Am. Compl., Dkt. No. 19).  The Amended Complaint brings claims under § 1983 for excessive force and failure to intervene in violation of the Eighth Amendment, (*id.* ¶¶ 117–38); negligent supervision, (*id.* ¶¶ 139–58); *Monell* liability, (*id.* ¶¶ 159–72); and due process and bodily integrity in violation of the Fifth and Fourteenth Amendments, (*id.* ¶¶ 173–82).  The Amended Complaint also brings state law claims for assault, battery, negligence, intentional infliction of emotional distress, and negligent infliction of

emotional distress.  (*Id.* ¶¶ 183–237).  The motion for summary judgment was fully briefed on November 12, 2025.  (Defs.' Mem. in Supp. of Summ. J. dated June 24, 2025 ("Defs.' Mot."), Dkt. No. 42-3[2]; Pl.'s Opp'n to Defs.' Mot. dated Aug. 29, 2025 ("Pl.'s Opp'n"), Dkt. No. 42-21; Defs.' Reply in Supp. of Summ. J. dated Nov. 12, 2025 ("Defs.' Reply"), Dkt. No. 42-40).

DISCUSSION

## I.      Eighth Amendment Excessive Force

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including the unnecessary and wanton infliction of pain."  *Jordan v. Walker*, No. 22-1118, 2024 WL 4635225, at *2 (2d Cir. Oct. 31, 2024) (quotations omitted).  "A claim that a government official has violated the Eighth Amendment by using excessive force has both a subjective and an objective component."  *Mustafa v. Pelletier*, No. 22-2187, 2023 WL 7537625, at *1 (2d Cir. Nov. 14, 2023).  The subjective component requires a showing that the defendant's actions were "characterized by wantonness in light of the particular circumstances surrounding the challenged conduct," and may be satisfied by demonstrating that "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, as the mistreatment alone may, in

---

[2] Although Defendants do not purport to bring this motion on behalf of the Suffolk County Sheriff's Department, (*see* Defs.' Mot. at 1), that Defendant is "an administrative arm of the County, without a legal identity separate and apart from the municipality and, therefore, without the capacity to sue or be sued," and is dismissed. *Barreto v. Suffolk County*, No. 10-CV-0028, 2010 WL 301949, at *2 (E.D.N.Y. Jan. 20, 2010) (quotation omitted); *see also Guggino v. Med. Dep't – Yaphank Corr. Facility*, No. 25-CV-0597, 2025 WL 1207665, at *5 (E.D.N.Y. Apr. 25, 2025) (collecting cases).  The Clerk of Court is directed to terminate the Suffolk County Sheriff's Department from the docket.

some circumstances, be sufficient evidence of a culpable state of mind." *Id.* (quotations omitted).

Defendants contend that the only officers who participated in the use of force are Bangel, Shaw, McManus, Dobriner, and Skolnick. (Defs.' Mot. at 7). They concede that Hawthorne was a participant and do not seek his dismissal. (Defs.' Reply at 3). Therefore, they contend that the excessive force claim against Snider, Richetti, DeFelice, Accardi, LaFranca, Zorcik, Lostritto, and Ervolino should be dismissed. (*Id.*).

"It is axiomatic that claims under § 1983 for use of excessive force or failure to intervene require personal involvement to trigger liability." *Demosthene v. City of New York*, 831 F. App'x 530, 535 (2d Cir. 2020); *see Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (quotation omitted)). Where "there is nothing in the record from which a rational jury could reasonably infer" that a defendant used force against the plaintiff, summary judgment is appropriate. *Demosthene*, 831 F. App'x at 535 ("Due to this lack of evidence regarding Detective Roberts's personal involvement in the alleged excessive use of force at the time of the line-up, the district court also properly dismissed this portion of Demosthene's excessive force and failure to intervene claims."); *Nguedi v. Caulfield*, 813 F. App'x 1, 3 (2d Cir. 2020) (dismissing excessive force claim for failure to allege personal involvement); *Delee v. Hannigan*, 729 F. App'x 25, 30–31 (2d Cir. 2018) (same); *Kornegay v. Doe*, 371 F. App'x 178, 179 (2d Cir. 2010) (same). There is no dispute that

10

Snider, Richetti, DeFelice, Accardi, LaFranca, Zorcik, Lostritto, and Ervolino did not

directly participate in the use of force.  This claim is therefore dismissed against them.

## II.     Failure to Intervene

Even if some officers did not directly use force against Cantarero Lopez, they

may still be held liable under a failure to intervene theory.

> A law enforcement officer has an affirmative duty to intercede on the behalf
> of a citizen whose constitutional rights are being violated in his presence by
> other officers, and is liable for the preventable harm caused by the actions
> of the other officers where that officer observes or has reason to know . . .
> that excessive force is being used.

*Porter v. Goord*, 467 F. App'x 21, 23 (2d Cir. 2012) (quotations omitted); *see also Randolph*

*v. Griffin*, 816 F. App'x 520, 523 (2d Cir. 2020) ("Prison officials can be held liable under

42 U.S.C. § 1983 for failing to intervene in a situation where another official is violating

an inmate's constitutional rights, including the use of excessive force, in their

presence.").  "Liability attaches on the theory that the officer, by failing to intervene,

becomes a 'tacit collaborator' in the illegality."  *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d

Cir. 2016).  But an officer may be held liable only if he "has sufficient time to act to

prevent it."  *Id.*

Defendants argue that there is no evidence that Snider, Richetti, LaFranca,

Zorcik, Lostritto, and Ervolino were present for the cell extraction, and DeFelice could

not observe what was happening inside the cell, so the failure to intervene claims

against them should be dismissed.  (Defs.' Mot. at 8).[3]  Cantarero Lopez only contends

---

[3] A failure to discipline claim sounds in *Monell* liability, not individual excessive force liability, and Cantarero Lopez's discipline claims are therefore discussed *infra*.

that DeFelice[4] is "clearly pictured on video watching through the cell bars as the other Defendants viciously attack the Plaintiff" and that it "can be seen on video that the Officers are punching and kicking the Plaintiff and those outside of the cell fail to intervene."  (Pl.'s Opp'n at 8).

Cantarero Lopez's argument cannot be squared with the undisputed facts he has admitted.  "DeFelice could not observe what was happening in the Plaintiff's cell at the time of the extraction and does not recall what he heard, if anything."  (Defs.' 56.1 Stmt. ¶ 150; Pl.'s 56.1 Resp. ¶ 150).  As for the others, Snider was not present for the cell extraction.  (*Id.* ¶ 293; Defs.' 56.1 Stmt. ¶ 293).  And Richetti and LaFranca were the investigator and supervisor assigned to review Cantarero Lopez's claim—there are no facts to suggest they had any involvement in or saw the cell extraction.  (*Id.* ¶¶ 73, 103; Pl.'s 56.1 Resp. ¶¶ 73, 103).  There are similarly no facts that could support a failure to intervene claim against Ervolino or Zorcik, who the parties agree responded to the initial incident when Cantarero Lopez was arguing with Lobianco, and who Accardi testified may have ordered him to assemble the cell extraction team, but who are never alleged to have been in the vicinity of the cell extraction.  *(Id.* ¶ 277; Defs.' 56.1 Stmt. ¶ 277; Pl.'s 56.1 Counterstatement ¶ 67; Defs.' 56.1 Resp. ¶ 67).  The only allegation regarding Lostritto is that he was responsible for recording the video of the cell extraction.  (Am. Compl. ¶ 27).  There is no suggestion or allegation that he could observe what was happening in the cell.

---

[4] Defendants do not seek to dismiss the failure to intervene claim against Accardi.  (Defs.' Reply at 5).

It is undisputed that these Defendants either were not present during the use of force or could not observe what was happening in the cell, or in Lostritto's case, there is no information at all about what he observed. On this record, without evidence that the subject officers "observe[d] the use of force" and had "sufficient time to act to prevent it," *Figueroa*, 825 F.3d at 106, they are entitled to summary judgment on the failure to intervene claim.

In summary, the claims for excessive force under a theory of direct participation or failure to intervene are dismissed against Snider, Richetti, DeFelice, LaFranca, Zorcik, Lostritto, and Ervolino. The excessive force claim against Accardi is dismissed insofar as it is asserted against him as a direct participant; though the failure to intervene claim against Accardi survives, as Defendants did not seek dismissal. The excessive force and failure to intervene claims against Hawthorne also survive, because Defendants did not seek his dismissal.

## III. Qualified Immunity

The Court turns to whether the remaining Defendants are entitled to qualified immunity on the excessive force claim against Bangel, Shaw, McManus, Dobriner, Skolnick, and Hawthorne, and the failure to intervene claim against Bangel, Shaw, McManus, Dobriner, Skolnick, Hawthorne, and Accardi.

"Qualified immunity shields government officials from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Matusak v. Daminski*, 165 F.4th 702, 711 (2d Cir. 2026) (quotation omitted). "When properly applied, it protects all but the

13

plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  To determine whether an official is entitled to qualified immunity, the court considers (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* (quotation omitted).  Courts may elect to address these elements in any order, *see Sacaza v. City of New York*, 169 F.4th 363, 370 (2d Cir. 2026), and here the Court begins with the second—whether the right at issue was clearly established.

"A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  A right is not clearly established if existing precedent does not place the constitutional question beyond debate."  *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (quotation omitted).  To identify a clearly established right, a court must generally[5] "identify a case where an officer acting under similar circumstances . . . was held to have violated the

---

[5] In an "obvious case," the high-level "reasonableness" considerations the Supreme Court has discussed may, without identification of a particular case, "clearly establish" an excessive force violation.  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *see also Seweid v. County of Nassau*, No. 21-CV-3712, 2024 WL 693981, at *14 (E.D.N.Y. Feb. 20, 2024) ("Qualified immunity is usually a game of find-that-case, but not always.  Common sense still plays a role.  This Court can examine, for example, whether qualified immunity applies based on the 'obviousness' of the alleged Constitutional violation—even in the absence of a controlling case exactly on point." (quoting *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam))).  Though the constitutional right here was clearly established by prior Supreme Court and Circuit precedent, taking the facts as Cantarero Lopez presents them as the Court must in this posture, *see Tracy v. Freshwater*, 623 F.3d 90, 99 (2d Cir. 2010) (finding summary judgment inappropriate where, "if a jury credited [plaintiff's] version of the events," it "might well conclude" that the force used was unreasonable), this may also be an "obvious case."

14

Constitution." *Id.* (quotation omitted).  And that case must "define the right with a high degree of specificity, so that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (quotation omitted).  General principles, like "an officer may not use unreasonable and excessive force," are not specific enough. *Id.* (quotation omitted).  "In short, officers receive qualified immunity unless they could have read the relevant precedent beforehand and known that it proscribed their specific conduct." *Id.* (quotation omitted).

As for the constitutional violation prong, if a claim is based on a clearly established right, defendants are protected by qualified immunity "only so long as 'it was objectively reasonable for [them] to believe that [their] acts did not violate those rights.'" *Levin v. City of Buffalo*, 179 F.4th 132, 142 (2d Cir. 2026) (per curiam) (quoting *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991)).  At summary judgment, if factual disputes "preclude a determination as to whether [defendants' conduct] was objectively reasonable," the Court cannot grant qualified immunity.  *Id.* at 142–43.[6]

---

[6] Recently, the Second Circuit has stated that "summary judgment is appropriate when a trier of fact would find that reasonable officers could disagree,"—that is, if a reasonable jury could go either way on whether the conduct was reasonable (for example, in a false arrest case, "if a reasonable jury *could* find that there was probable cause"), then officers get the benefit of qualified immunity.  *Sacaza*, 169 F.4th at 373 (quoting *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995)).  But that analysis only applies "when the factual record is not in serious dispute." *Lennon*, 66 F.3d at 421 (quotation omitted); *compare Sacaza*, 169 F.4th at 371 (basing its holding "on the *undisputed* facts in the record" (emphasis added)), *with Levin*, 179 F.4th at 142–43 (denying qualified immunity at summary judgment because of factual disputes as to objective reasonableness and whether a constitutional violation occurred).  That is not the case here.

Timing is also critical.  Cases decided after the events at issue cannot be used to determine that a right is clearly established.  *Matusak*, 165 F.4th at 714–15.  But the Court may consider cases published after the conduct at issue that address "whether a right was clearly established by case authority *before* the time of such conduct."  *Id.* at 715 (quotation omitted).  The use of force at issue in this case occurred on March 24, 2022.

Defendants argue that they are entitled to qualified immunity because they were justified in their use of force to remove Cantarero Lopez from his cell, since he had thrown toilet water and spit blood at a neighbor, and because he "deliberately refused to respond and/or was slow to respond to the extraction team's commands."  (Defs.' Mot. at 21; *see also* Defs.' Reply at 12).  They also argue that the video footage of the extraction—which does not provide much, if any, insight into what exactly happened inside the cell—"demonstrates the need for the use of force."  (Defs.' Reply at 12).  For the reasons explained below, the right at issue was clearly established, and factual disputes preclude resolution of whether it was objectively reasonable for Defendants to believe their conduct was lawful.  Accordingly, the Court cannot grant Defendants qualified immunity at this juncture.

### A.    Clearly Established Law

The right at issue here—as Cantarero Lopez presents it, to be free from repeated inflictions of force by punching and kicking when he was not resisting under the Eighth Amendment, (Pl.'s Opp'n at 18)—was clearly established, *see Hudson v. McMillian*, 503 U.S. 1, 4, 10 (1992) (punching and kicking a restrained incarcerated person, leading to bruises, swelling, and a cracked dental plate, constitutes an Eighth Amendment

16

violation).  *Hudson* puts beyond debate that a reasonable officer would have been on notice that repeatedly punching, kicking, and otherwise assaulting an incarcerated person who is not resisting violates his Eighth Amendment rights.  *See also Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (finding an Eighth Amendment violation where prison officials sprayed the plaintiff with feces, vinegar, and machine oil, burning his eyes and leaving him with physical injuries); *Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002) (tying an incarcerated person to a hitching post for hours in the hot sun was a gratuitous infliction of unnecessary pain that violated the clear prohibitions of the Eighth Amendment); *Harris v. Miller*, 818 F.3d 49, 64 (2d Cir. 2016) ("[C]ertain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations *per se*.  This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." (quotation omitted)).

###    B.    Constitutional Violation

Turning to whether it was "objectively reasonable"[7] for Defendants to believe their conduct did not violate Cantarero Lopez's clearly established Eighth Amendment

---

[7] Although Eighth Amendment excessive force violations require a subjective inquiry into defendants' motivations for their actions, "[t]he Supreme Court has made clear that qualified immunity turns on an *objective* assessment of the defendant's actions."  *Clark v. Valletta*, 157 F.4th 201, 217 (2d Cir. 2025) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[Q]ualified immunity's reasonableness inquiry . . . 'remain[s] distinct' from constitutional standards."  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 204–05 (2001)).  Courts cannot "collapse" Eighth Amendment subjective inquiries into the objective-reasonableness standard—in other words, excessive force and qualified immunity inquiries do not merge—and so the Court does not assess the subjective inquiry here.  *Id.* at 217 & n.14.

rights, factual disputes preclude resolution at this juncture.  *See Levin*, 179 F.4th at 142–43.

Cantarero Lopez testified that he complied with the instructions to stand against the wall of his cell, but was pushed, causing him to fall on the ground, and then, while he was not resisting, officers dragged him on the floor, pinned him down, restrained him, and repeatedly struck him.  (Pl.'s 56.1 Counterstatement ¶¶ 20–23, 27–28); *see Randolph*, 816 F. App'x at 523 (plaintiff may rely exclusively on his own testimony to counter summary judgment).  Defendants vigorously dispute this, relying on officer accounts that Cantarero Lopez was noncompliant and the video of the extraction, which they assert does not depict Cantarero Lopez being punched or struck.  (*E.g.*, Defs.' 56.1 Resp. ¶¶ 20–22, 27–28).  But the video of the cell extraction does not clearly show the contact with Cantarero Lopez in the cell: it does not clearly resolve the parties' divergent accounts.  And there is no argument that the force used was *de minimis* or dispute as to the extent of the injuries incurred: Cantarero Lopez was hospitalized for ten days because of internal bleeding that required surgery, and also received stitches and replacement of a tooth that was knocked out during the cell extraction.  (Defs.' 56.1 Stmt. ¶¶ 47–49, 53; Pl.'s 56.1 Resp. ¶¶ 47–49, 53).

In light of these facts, it is impossible to determine whether any reasonable jury could find that it was objectively reasonable for Defendants to believe that their conduct did not violate Cantarero Lopez's rights.  *See Kaminsky*, 929 F.2d at 927 (upholding denial of qualified immunity at summary judgment where the district court "correctly decided that [it] could not determine whether it was objectively reasonable for

18

[defendants] to believe their acts were lawful, because the facts in dispute were relevant to that determination"). Taking the facts as Cantarero Lopez recounts them—that he was repeatedly assaulted by multiple officers while compliant, nonresistant, and restrained on the floor of his cell—as the Court must at this stage, there is no serious argument that Defendants' belief in the lawfulness of their conduct was reasonable. *See Russell v. Scott*, 170 F.4th 83, 93 (2d Cir. 2026) (explaining the proper inquiry as "whether, on the facts as testified to by [plaintiff], [defendant] violated [plaintiff's] rights"); *e.g.*, *Burris v. Dezelic*, No. 14-CV-5540, 2026 WL 865838, at *10 (E.D.N.Y. Mar. 30, 2026) (denying qualified immunity "[b]ecause there remain material factual disputes as to the extent, reasonableness, and purpose of the force used"); *Jackson v. Downstate Corr. Facility*, No. 16-CV-0267, 2020 WL 7630351, at *10 (S.D.N.Y. Dec. 22, 2020) (denying qualified immunity "[b]ecause there is a dispute of material fact over whether Plaintiff was noncompliant with a reasonable order and whether any force was used on Plaintiff at all"); *Vann v. Sudranski*, No. 16-CV-7367, 2020 WL 3001072, at *7 (S.D.N.Y. June 4, 2020) ("[T]here is a genuine factual dispute concerning whether C.O. Sudranski used excessive force against plaintiff . . . . [I]t would not have been objectively reasonable for C.O. Sudranski to have believed he could lawfully violate [plaintiff's Eighth Amendment right to be free from excessive force] by forcefully striking plaintiff in the groin during a routine pat frisk."); *Ellis v. Catalano*, No. 16-CV-8452, 2020 WL 1956963, at *15 (S.D.N.Y. Apr. 23, 2020) ("Plaintiff attests that he was repeatedly punched absent provocation or resistance. The Court cannot conclude as a matter of law that a

19

reasonable officer would believe that such conduct did not violate the Eighth Amendment.").

Because fact disputes preclude resolution of whether Defendants' conduct was objectively reasonable, qualified immunity is inappropriate. "[T]he ultimate resolution of who is telling the truth . . . must be made by a jury, since there are clearly disputed issues of fact and credibility determinations that cannot be made by a court on a motion for summary judgment. All that matters now is that, if believed, [plaintiff's] allegations establish a constitutional violation." *Hayes v. Dahlke*, 976 F.3d 259, 276 & n.8 (2d Cir. 2020) (denying qualified immunity because of clear "factual dispute as to whether Dahlke ever engaged in the conduct alleged by Hayes," and "no doubt that the illegality of such conduct was clearly established"); *Russell*, 170 F.4th at 98 (denying qualified immunity because "the facts favorable to [plaintiff] that the . . . jury might find" would amount to a violation of plaintiff's constitutional rights, and leaving the ultimate determination to the factfinder on whether the conduct was in fact objectively reasonable (quotation omitted)).

## IV.    *Monell* **Liability**

A municipality may be held liable under § 1983 if the deprivation of the plaintiff's constitutional rights "is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*,

20

982 F.3d 86, 97 (2d Cir. 2020).  A plaintiff may establish the existence of a municipal

policy giving rise to *Monell* liability in separate ways, including:

> (1) a formal policy endorsed by the municipality . . . ; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy . . . ; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware . . . ; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees.

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589–90 (2d Cir. 2019) (quotations and

citations omitted).  "[I]solated acts of excessive force by non-policymaking municipal

employees are generally not sufficient to demonstrate a municipal custom, policy, or

usage that would justify municipal liability." *Jones*, 691 F.3d at 81.  Such isolated acts

could justify municipal liability if they "were done pursuant to municipal policy," if

they "were sufficiently widespread and persistent to support a finding that they

constituted a custom, policy, or usage of which supervisory authorities must have been

aware," or if "a municipal custom, policy, or usage would be inferred from evidence of

deliberate indifference of supervisory officials to such abuses." *Id.*  Or, "[a] plaintiff

alleging that she has been injured by the actions of a low-level municipal employee can

establish municipal liability by showing that a policymaking official ordered or ratified

the employee's actions—either expressly or tacitly." *Id.*

21

Cantarero Lopez's *Monell* theories are as follows: 1) failure to discipline, act, or supervise by municipal policymakers; and 2) a pattern of failing to report other officers for excessive force. (Pl.'s Opp'n at 9–12).[8] Each theory fails.

First, Cantarero Lopez argues that no officers were disciplined in connection with the force used against him, and he notes two individuals—Sergeant Accardi, who oversaw the extraction, and LaFranca, who was a supervisor within the Internal Affairs unit—that are final policymakers for *Monell* purposes. (*Id.* at 11). He appears to contend that this incident was "sufficiently severe" and resulted in no discipline by supervisors whose actions constitute final policy decisions. (*Id.*)

While *Monell* liability may be imposed in situations of "deliberate indifference of supervisory officials" to excessive force, such "supervisory officials" must be "persons in policy-making roles, whose misfeasance could trigger municipal liability under *Monell*." *Jones*, 691 F.3d at 81 & n.6. Merely holding the title of supervisor or sergeant does not confer an officer with final policymaking authority. *See Friend v. Gasparino*, 61 F.4th 77, 94 (2d Cir. 2023) ("[T]he official must have been sufficiently high up in the municipal hierarchy that he was responsible under state law for making policy in that area of the municipality's business." (quotation omitted)); *Agosto*, 982 F.3d at 98 ("[T]he

---

[8] Cantarero Lopez also seems to argue that deliberate indifference to his medical needs gives rise to a *Monell* claim. (*See* Pl.'s Opp'n at 10, 12). The exact theory of municipal liability he is claiming is unclear. There is no automatic liability for such an Eighth Amendment violation: the case he cites in support of this argument *denied Monell* liability premised on such a theory. *See Bradshaw v. City of New York*, 855 F. App'x 6, 11 n.2 (2d Cir. 2021). To the extent he bases this claim on a theory that policymaking officials' deliberate indifference justifies municipal liability, that claim fails for the reasons discussed *infra*.

official must have had state-law authority to adopt rules for the conduct of the municipal government." (quotation omitted)).  Cantarero Lopez presents no evidence — factual or legal — of any Defendant's policymaking authority.  (*See* Pl.'s Opp'n at 11 (relying on conclusory statements like "Sergeant Accardi is a policy maker for the purposes of *Monell* liability")).  This *Monell* theory therefore fails.  *See Friend*, 61 F.4th at 94; *e.g.*, *Miller v. Nassau County*, No. 13-CV-6813, 2015 WL 13745261, at *9 (E.D.N.Y. Oct. 22, 2015) (recommending dismissal of *Monell* claim and noting no evidence that corrections officers acted with final policymaking authority), *report and recommendation adopted*, 2015 WL 8055302 (Dec. 7, 2015); *Raphael v. County of Nassau*, 387 F. Supp. 2d 127, 132 (E.D.N.Y. 2005) ("The mere fact that one of the alleged state actors was a Sergeant does not by itself make him a 'policymaker' for purposes of municipal liability. . . . Even if Sergeant Mulcahy may have been the ranking officer on the scene and thus may have had some decision-making authority over the conduct of the other officers, the mere exercise of discretion is insufficient to establish municipal liability." (citing *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003))).

Second, Cantarero Lopez points to testimony by various Defendants that they have never reported another officer for excessive force, or, for those on the investigative side, had never made a finding of excessive force against an officer.  (Pl.'s Opp'n at 10, 12).  But he points to no evidence upon which a jury could rely to conclude that there were incidents of excessive force in the first place that officials failed to report.  In other words, he has not produced evidence of a single other instance of an excessive force

23

violation, let alone one that went unreported by other officers that witnessed it.[9]  The

failure to point to any such evidence bars this *Monell* theory.

Because there is no evidence in the record of actions by policymaking officials

with respect to the use of force against Cantarero Lopez, nor is there evidence of a

policy or practice of excessive force incidents that go unreported, Defendants' motion

for summary judgment is granted as to the *Monell* claim.

## V.    Due Process and Bodily Integrity

Defendants contend that Cantarero Lopez's substantive due process claim under

the Fifth and Fourteenth Amendments is duplicative of his Eighth Amendment claim

for the same conduct, and the Court agrees.  If a specific Amendment "provides an

explicit textual source of constitutional protection . . . , that Amendment, not the more

generalized notion of 'substantive due process,' must be the guide for analyzing these

claims."  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also United States v. Lanier*, 520

---

[9] Cantarero Lopez's expert report, relying only on the officer testimony that they had never used, witnessed, or reported an incident of excessive force, summarily concludes that "strongly suggests a pattern" as to excessive force, deficient training, and inadequate investigations.  (*See* Report of Wade Carper, attached to Pl.'s Opp'n as Ex. Q, Dkt. No. 42-38 ¶¶ 109–11, 114).  But the fact that the expert draws the same conclusion that Cantarero Lopez's lawyer does from the absence of prior reporting does not make it any more probative for determining *Monell* liability.  And even crediting the three prior use of force incidents Cantarero Lopez references elsewhere, though all were deemed unsubstantiated, (*see* Pl.'s 56.1 Counterstatement ¶¶ 450–52; Defs.' 56.1 Resp. ¶¶ 450–52), that would still not be sufficient to impose *Monell* liability, *e.g.*, *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (holding that four examples of possible prior similar misconduct "falls far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability" (quotation omitted)); *Hu v. City of New York*, 927 F.3d 81, 106 (2d Cir. 2019) (identifying four prior instances of misconduct was insufficient to suggest a widespread, persistent pattern); *Jones*, 691 F.3d at 85 (three prior incidents insufficient).

U.S. 259, 272 n.7 (1997) ("*Graham* . . . requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *20 Dogwood LLC v. Village of Roslyn Harbor*, No. 23-0930, 2024 WL 1597642, at *1 (2d Cir. Apr. 12, 2024) ("The district court dismissed the substantive due process claim because it concluded the claim was subsumed by more particularized allegations of other provisions of the Constitution providing an explicit textual source of protection.  We agree."); *Collins v. Putt*, 979 F.3d 128, 136 (2d Cir. 2020) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.  Under such circumstances, a plaintiff's substantive due process claim is either subsumed in his more particularized allegations, or must fail." (quotations omitted)).  Cantarero Lopez's substantive due process claim is subsumed by his more particularized Eighth Amendment excessive force claim.  *See Graham*, 490 U.S. at 395 n.10 ("Any protection that 'substantive due process' affords convicted prisoners against excessive force is . . . at best redundant of that provided by the Eighth Amendment.").  Defendants' motion for summary judgment on that basis is granted.

25

## VI.   State Law Claims[10]

Defendants seek summary judgment on Cantarero Lopez's state law claims for intentional and negligent infliction of emotional distress ("IIED" and "NIED"), assault and battery, negligent supervision, and negligence.  (Defs.' Mot. at 14–15, 17).

### A.   Emotional Distress Claims

As a preliminary matter, "the New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct falls well within the ambit of other traditional tort liability," and "[a]ll four Appellate Division courts have answered the question and held that it cannot." *Salmon v. Blesser*, 802 F.3d 249, 256–57 (2d Cir. 2015) (quotation omitted) (dismissing IIED claim where conduct could give rise to battery claim); *see also Goldrich v. Masco Corp.*, No. 22-CV-3769, 2023 WL 2649049, at *10 (S.D.N.Y. Mar. 27, 2023) (explaining that the same principles apply to NIED claims).  This is because infliction of emotional distress torts "ha[ve] [their] roots in the acknowledgment by the courts of the need to provide relief in those circumstances *where traditional theories of recovery do not*."  *Lee v. McCue*, 410 F. Supp. 2d 221, 226 (S.D.N.Y. 2006) (quotation omitted).

As such, courts regularly dismiss IIED and NIED claims where other torts—like assault and battery—impose liability for the complained-of conduct.  *See, e.g., Crews v. County of Nassau*, 996 F. Supp. 2d 186, 214 (E.D.N.Y. 2014) ("Even assuming *arguendo*

---

[10] Defendants only move for summary judgment on qualified immunity grounds as to Cantarero Lopez's federal claims. (Defs.' Mot. at 18 (only asserting qualified immunity as to § 1983 liability)).  They do not assert any state qualified immunity defense as to these state law claims.

that plaintiff could meet all four elements of an IIED claim, New York courts do not allow IIED claims where the conduct complained of falls well within the ambit of other traditional tort liability." (quotation omitted)); *Hepburn v. City of New York*, No. 21-CV-4158, 2025 WL 1640205, at *18 (E.D.N.Y. June 10, 2025) ("Because the conduct at issue and any resulting damages are entirely encompassed by Plaintiff's claims for false arrest and excessive force, Plaintiff's IIED and NIED claims are dismissed."). Accordingly. Cantarero Lopez's emotional distress claims are dismissed because the underlying conduct is actionable under traditional torts of assault and battery.

## B.   Assault and Battery

Defendants make no argument that Cantarero Lopez's assault and battery claims cannot be maintained alongside their excessive force claims. And though, only in reply, Defendants contend that courts have dismissed assault and battery claims where excessive force claims also failed because the legal standard is similar, that supplies no basis to dismiss assault and battery claims where, as here, Cantarero Lopez's excessive force claim under § 1983 survives, *e.g.*, *Cornell v. Village of Clayton*, 691 F. Supp. 3d 608, 622 (N.D.N.Y. 2023) ("For the same reasons set forth with respect to plaintiff's excessive force claim, plaintiff's battery and assault claims against the Village survive summary judgment."); *Rizk v. City of New York*, 462 F. Supp. 3d 203, 229 (E.D.N.Y. 2020) (same). Defendants' motion for summary judgment on the assault and battery claims is denied.

## C.   Negligent Supervision

The Amended Complaint contends that the "lack of proper training and supervision of these Correction Officers were contributing factors in the vicious attack

27

upon [Cantarero Lopez]." (Am. Compl. ¶ 140). Though it is technically asserted against all Defendants, Cantarero Lopez only defends the claim as against Suffolk County. (Pl.'s Opp'n at 13). And while the claim is pleaded through § 1983, (Am. Compl. at 22), the parties appear to understand this to be a negligent supervision claim under New York state law, (*see* Pl.'s Opp'n at 13 (reciting the elements of a claim for negligent supervision under New York law)).[11] The claim fails.

"To maintain a claim against a municipal employer for the negligent hiring, training, and retention of a tortfeasor under New York law, a plaintiff must show that the employee acted outside the scope of her employment." *Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013) (quotation omitted). Cantarero Lopez offers no response to Defendants' argument on this element, (*see* Defs.' Mot. at 14–15), and there is no evidence in the record from which a jury could conclude that the corrections officers were acting outside the scope of their employment, and so Defendants are entitled to summary judgment, *see Velez*, 730 F.3d at 137. The negligent supervision claim is dismissed.

### D.    Negligence

Cantarero Lopez brings a separate claim for negligence, alleging that Defendants "had a duty to act reasonably . . . in a manner that would [not] cause injury," a duty they breached by "subjecting him to an unprovoked, violent attack." (Am. Compl.

---

[11] To the extent Cantarero Lopez alleges this failure to supervise or train as a *Monell* claim under § 1983, it would fail for the reasons explained above. *E.g.*, *Greene v. City of New York*, 742 F. App'x 532, 536–37 (2d Cir. 2018) (dismissing *Monell* claim for failure to supervise or train).

¶¶ 207–08).  Defendants only seek dismissal on the ground that "a general claim of negligence is not actionable under § 1983," (Defs.' Mot. at 18), but that has no bearing on this state law negligence claim, which is not brought under § 1983.  Though much of this claim is based on the same conduct that is the basis of the alleged assault and battery (both intentional torts), Cantarero Lopez is permitted to proceed on a theory of negligence in the alternative, unless "no reasonable jury could find negligence," which is not the case here.  *King v. Davis*, No. 25-0966, 2026 WL 762399, at *3 (2d Cir. Mar. 18, 2026).

To summarize with respect to the state law claims, Cantarero Lopez's claims for IIED, NIED, and negligent supervision are dismissed.  But Defendants' motion for summary judgment is denied with respect to the claims for assault, battery, and negligence.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgement is granted in part and denied in part.  The excessive force claim is dismissed against Defendants Snider, Richetti, DeFelice, LaFranca, Zorcik, Lostritto, Ervolino, and Accardi; the failure to intervene claim is dismissed against Defendants Snider, Richetti, DeFelice, LaFranca, Zorcik, Lostritto, and Ervolino; and the claims for *Monell* liability, due process or bodily integrity violations, negligent supervision, and emotional distress are dismissed.  The excessive force claim otherwise survives against Bangel, Shaw, McManus, Dobriner, Skolnick, and Hawthorne, and the failure to intervene claim survives against Bangel, Shaw, McManus, Dobriner, Skolnick, Hawthorne, and Accardi.

29

The state law claims for assault, battery, and negligence survive against all individual Defendants.

The parties are directed to submit a joint proposed pretrial order by **August 28, 2026**, consistent with the undersigned's Individual Practices.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:   July 29, 2026
          Central Islip, New York

30